IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

WESLEY CAIN GADDIS,              )    CIVIL ACTION NO. 9:17-224-MGL-BM
                                  )
                                  )
                  Plaintiff,     )
                                  )
v.                              )    **REPORT AND RECOMMENDATION**
                                  )
COMMISSIONER OF SOCIAL      )
SECURITY ADMINISTRATION,    )
                                  )
                  Defendant.   )
_____)

       The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

       Plaintiff applied for Disability Insurance Benefits (DIB) on January 15, 2013 (protective filing date), alleging disability beginning May 15, 2008 due to social anxiety disorder, obsessive compulsive personality disorder, depression, panic disorder with agoraphobia, lower back pain, and shoulder pain due to arthritis/torn rotator. (R.pp. 19, 179, 213). Plaintiff's claim was denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on May 20, 2015. (R.pp. 41-89). The ALJ thereafter denied Plaintiff's claim in a decision issued July 16, 2015. (R.pp. 19-36). The Appeals



Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner.  (R.pp. 1-5).

Plaintiff then filed this action in United States District Court.  Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded to the Commissioner for an award of benefits, or alternatively that the case should be remanded for further proceedings.  The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

## Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980).  If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision.  Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Nothing that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

2



The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## Medical Records

Dr. Khizar Khan, a psychiatrist, initially assessed Plaintiff with depression and anxiety on May 28, 2008. Plaintiff reported he had been given "time off" from his job as an assistant manager at Advanced Auto Parts after he verbally assaulted his district manager. Plaintiff reported that he could not control his emotions and threatened people at work, and had problems with sleep, anhedonia, feeling overwhelmed/helpless, low energy, concentration, poor appetite, and mood irritability. He took Paxil without seeing a difference in mood. Dr. Khan diagnosed moderate to severe major depressive disorder, generalized anxiety disorder, and panic disorder. Effexor and Xanax were prescribed. (R.pp. 280-281). On June 11, 2008, Plaintiff told Dr. Khan that he felt a little jittery and avoided social interactions, but was not experiencing as immense an amount of panic attacks as in the past. (R.p. 279). Plaintiff was thereafter seen by Dr. Khan one or twice a month until November 4, 2008. (R.pp. 271-278).

On September 30, 2009, Plaintiff was treated by Dr. Kimberly Rothman at AnMed Health Family Medicine Center (AnMed) for bilateral shoulder pain and hypertension. Plaintiff reported that his shoulder had been hurting for about eight months after he lifted a heavy transmission. Dr. Rothman noted weakness in Plaintiff's right hand and paresthias in his lateral arm



and finger; diagnosed left rotator cuff syndrome, cervical radiculopathy, and anxiety; and prescribed a Medrol dose pack to help reduce inflammation. (R.pp. 324-325).

Dr. Joseph McElwee, a psychiatrist at AnMed, began treating Plaintiff's anxiety on October 13, 2009. Plaintiff reported he had discontinued previous psychological medications due to side-effects of feeling emotionally numb or drunk. He described having an obsession with order (needing to see things in their right place), compulsions to clean, and washing his hands at length multiple times a day from a young age. This led to conflict at work where he would have issues with others' disorderliness. Plaintiff reported strong anxiety toward being around people and being out in groups to the point of avoiding those situations altogether. He appeared mildly anxious and was tearful at times when talking about his childhood and raising his son, and reported feelings of hopelessness, anxiety, stress, and sadness. Dr. McElwee diagnosed compulsive personality disorder and prescribed Celexa. (R.pp. 295-298).

On October 20, 2009, Plaintiff reported to Dr. Rothman that he had improvement of his shoulder and neck pain with medication and three physical therapy sessions. (R.pp. 311-314).

On October 28, 2009, Plaintiff told Dr. McElwee that he had a slight decrease in his anxiety in social situations, but no change in his obsessive-compulsive symptoms. Dr. McElwee wrote that Plaintiff had "long standing difficulty with cleanliness issues, superstitious behaviors, intrusive thoughts and other issues." He noted that Plaintiff's prior medications had not worked well, diagnosed obsessive compulsive disorder (OCD), directed Plaintiff to begin work in an anxiety workbook and continue individual therapy, and prescribed Celexa. (R.pp. 291-294). Plaintiff returned to Dr. McElwee in January 2010 and again in February 2010, at which time Plaintiff reported being



better able to control some of his compulsions.  No depression and decreased anxiety were noted. (R.pp. 286-290).

In July 2010, Dr. Rothman completed a mental impairment questionnaire in which she stated that Plaintiff was diagnosed with OCD and depression for which he was taking Celexa and Xanax, and that she had referred Plaintiff to Dr. McElwee.  She indicated that Plaintiff was oriented x4 and had obsessive thought content, a worried/anxious mood/affect, adequate attention/concentration, and good memory.  Dr. Rothman opined that Plaintiff had a slight work-related limitation in function due to his mental condition, consisting of outbursts of anger with coworkers, OCD behaviors, and exhibiting significant anxiety.  She thought he was capable of managing his funds.  (R.p. 356).

Dr. Brian Keith, a psychologist, performed a consultative examination on the Plaintiff on November 18, 2010.  Plaintiff told Dr. Keith that he experienced panic attacks and had trouble being with people.  He complained of nervousness, depression, no motivation, trouble failing asleep, feeling fatigued, and feeling hopeless.  Plaintiff stated that people made him feel nervous, he was scared of people, and that he was unable to work because he could not deal with people and was afraid of hurting somebody.  For activities, Plaintiff reported driving his son to school three or four times a week, rarely doing grocery shopping, occasionally going to Wal-Mart at midnight, and getting food from a drive-through restaurant.  On examination Plaintiff was found to be oriented in all spheres; he had appropriate eye contact, a broad (normal) affect, and a nervous mood; his psychomotor functioning was normal, although he appeared at times somewhat nervous and fidgety and rubbed his hands in a nervous manner; and his remote memory appeared generally intact and he was able to correctly repeat five numbers after immediate presentation and two of three items after



a five-minute delay with interference. Dr. Keith diagnosed Plaintiff with bipolar disorder and generalized anxiety disorder, and opined that Plaintiff should be able to complete moderately complex tasks, follow moderately detailed directions, and complete two to three-step activities. (R.pp. 357-360).

On December 2, 2010, State agency psychologist Dr. Robbie Ronin opined after a review of Plaintiff's records that Plaintiff could maintain attention and concentration for extended periods, ask simple questions and request assistance, interact appropriately with coworkers and supervisors, adapt to basic workplace demands, perform simple unskilled tasks, but could not work with the public. (R.pp.362-379).

On April 13, 2012, Plaintiff returned to AnMed to reestablish primary care and resume treatment with Dr. McElwee (he had not had treatment for approximately two years due to lack of insurance). Dr. McElwee reviewed the case with primary care physician Dr. Jason Perey, who diagnosed plantar fasciitis, OCD, depression, left rotator cuff syndrome, hypertension, and hyperlipidemia, and prescribed Medrol, Xanax, Celexa, and Lisinopril-Hydrochlorothiazide. (R.pp. 384-388). On May 14, 2012, Plaintiff reported that his feet were better, that exercises and medication had diminished his shoulder pain some, but that he had had an episode of severe pain when working in the yard the prior weekend. (R.pp. 396-399). On May 16, 2012, Plaintiff reported to Dr. McElwee that he was still living with his father and that he had his son 75% of the time. He also reported that he had broken up with his girlfriend because his OCD was bothering her, and that he continued to have a lot of social anxiety. Dr. McElwee noted that Plaintiff had a very obsessive thought process, was anxious, and was sweating at times; assessed OCD; increased Plaintiff's Celexa dosage, and continued Xanax. (R.pp. 542-544).



6

In May 2012, an x-ray of Plaintiff's left shoulder was normal, an x-ray of his cervical spine showed normal alignment with no tissue swelling or evidence of atlanto-axial dislocation. and an x-ray of his right shoulder revealed a "well circumscribed sclerotic density in the right humeral head most consistent with a bone island" and a degenerative change of the right acromioclavicular joint. (R.pp. 400-405).

On June 14, 2012, Plaintiff reported to Dr. McElwee that his anxiety was "some" better and that he did "ok" attending his son's school program. Plaintiff's affect was more reactive with improved mood and less anxiousness. Celexa was continued. (R.pp. 539-541). On July 9, 2012, Plaintiff reported some success as to his excessive handwashing, but still had difficulty turning off repetitive thoughts when he tried to sleep. Dr. McElwee noted that Plaintiff had an anxious, obsessive, and passive mood and diagnosed social phobia and OCD. (R.pp. 534-536). On August 15, 2012, Plaintiff reported to Dr. McElwee some progress in checking doors and handwashing less and that he had been able to go to his son's school, but his only social contact was with his parents. Plaintiff had an anxious affect. (R.pp. 532-533).

On August 24, 2012, Plaintiff reported to Dr. Perey that his shoulder felt much better with better range of motion, he was doing a lot of yard work and that digging post holes gave him some pain, but he otherwise felt great. Plaintiff had complete and full range of motion bilaterally in his shoulders. (R.pp. 529-531).

On September 19, 2012, Plaintiff reported to Dr. McElwee that he had progress with handwashing, picking at his fingers, and checking of locks. However, Plaintiff reported debilitating sweating and was "convinced" that Celexa made this worse, so the plan was to hold Celexa for a week to see if sweating improved. (R.pp. 524-525). On September 21, 2012, Plaintiff complained



to Dr. Perey of low back pain radiating to his right leg/foot after doing yard work on a bulldozer in which he got his body turned around. Dr. Perey diagnosed acute lumbar spine, and prescribed Mobic and back exercises. (R.pp. 413-415, 521-523). On November 21, 2012 Plaintiff reported he was better after being back on Celexa and that he had not noted any significant increase in sweating. However, he complained of a lot of worsening problems with his leg after he had to pick his father up off the floor. He also reported that he had a new girlfriend. Dr. McElwee noted that Plaintiff's hands were less red with no excoriation and that Plaintiff was still anxious, but improved. (R.pp. 516-518).

On January 2, 2013, Plaintiff reported having a hard time going to medical appointments due to anxiety and not wanting to take Xanax due to fear of medication dependency. Plaintiff reported having more stress because he was away from his son more over Christmas. Dr. McElwee noted that Plaintiff was more anxious that day and diagnosed OCD. (R.pp. 513-515). On January 3, 2013, Dr. Perey noted that Plaintiff had decreased strength of his right lower extremity compared to his left lower extremity, but had normal reflexes and no sensory loss. Acute lumbar strain was diagnosed and the plan was to get an MRI. (R.pp. 510-512). The MRI revealed multilevel degenerative disc disease particularly in the upper lumbar spine with mild disc bulges at L4-5 and L5-S1. (R.pp. 508-509). On February 27, 2013, Plaintiff complained that he needed to go to a school function the next week and had been dreading it and agreed to take a Xanax that day. Dr. McElwee noted that Plaintiff's mood and affect were "still anxious." (R.pp. 504-505).

On March 21, 2013, Dr. Perey completed a form in which he noted that Plaintiff's mental diagnosis was OCD. He opined that Plaintiff was fully oriented with adequate attention/concentration and good memory, but had a distractible thought process, obsessive thought



content, and worried/anxious mood/affect. Dr. Perey further opined that Plaintiff exhibited a serious work-related limitation in function due to his mental condition (he did not comment on the work-related function), but was capable of managing his funds. (R.p. 426).

On April 10, 2013, Plaintiff reported that he was able to go to his son's program, but took a Xanax and practiced breathing most of the day. He said he was doing better with his handwashing and checking behaviors, and that agoraphobia was his most limiting issue. Dr. McElwee noted that Plaintiff had obsessive and rigid thoughts and was anxious. (R.p. 501-503).

In May 2013, State agency physician Dr. Dale Van Slooten opined after a review of Plaintiff's records that he could occasionally lift fifty pounds and frequently lift twenty-five pounds; stand and/or walk for about six hours in an eight-hour day; sit for about six hours in an eight-hour day; push and pull on an unlimited basis; frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and occasionally climb ladders, ropes, and scaffolds. (R.pp. 98-99).

On May 29, 2013, Plaintiff reported to Dr. McElwee that he had had a panic attack at awards day for his son and that he was sleeping some better with Neurontin. He also reported he had stress from having his father living with him and having his mother coming to visit. Dr. McElwee noted that Plaintiff's mood and affect were anxious, but not depressed. (R.pp. 498-500).

On June 4, 2013, Dr. Keith noted that Plaintiff had a broad affect, normal psychomotor functioning and locomotion, clear speech, coherent and linear conversation, and intact reasoning and judgment. Plaintiff was nervous and frequently rubbed and wrenched his hands during the examination. Dr. Keith suspected that Plaintiff should have help with funds, if awarded. Diagnoses included generalized anxiety disorder, OCD, and bipolar disorder. Dr. Keith opined that Plaintiff had average to above average cognitive functioning, could complete moderately complex tasks, could



follow moderately complex instructions, reported ongoing obsessive behaviors (continuous handwashing, showering, and checking doors at night) which could interfere with his day-to-day functioning with a job setting, and had significant difficulty staying on task and frequently needed redirection. (R.pp. 427-430).

In July 2013, state agency psychologist Dr. Craig Horn opined that Plaintiff's mental impairments caused a mild restriction in Plaintiff's activities of daily living; moderate difficulties in social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. (R.p. 96). In an accompanying mental RFC assessment, Dr. Horn opined that Plaintiff's mental impairments would not cause significant limitations in carrying out very short, simple, or detailed instructions; performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, sustaining an ordinary routine without special supervision, making simple work-related decisions, completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. He thought that Plaintiff's mental impairments would cause moderate limitations in Plaintiff's ability to maintain attention and concentration for extended periods and work in coordination with or in proximity to others without being distracted by them. (R.pp. 99-100). With respect to social interaction, Dr. Horn opined that Plaintiff's mental impairments would cause no significant limitations in the ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, and

10



adhere to basic standards of neatness and cleanliness, and moderate limitations in his ability to interact appropriately with the general public. (R.p. 100).

In July 2013, State agency physician Dr. Frank Ferrell reviewed the updated record and concurred with Dr. Van Slooten's opinion that Plaintiff could perform medium work with postural restrictions. (R.pp. 113-114).

On July 24, 2013, Plaintiff reported being more irritable as he was having increased conflict with his ex-wife and mother and was dreading having to go to his son's football games. Dr. McElwee noted that Plaintiff was mildly agitated on arrival, but calmed rapidly and otherwise his psychiatric examination was normal. (R.pp. 495-497).

In September 2013, State agency psychologist Dr. Xanthia Harkness concurred with Dr. Horn's opinion. (R.pp. 111, 115-116).

On September 5, 2013, Plaintiff reported that his OCD symptoms had worsened since his son returned to school and the son was spending more time at his mothers which allowed Plaintiff more time to obsess and because it demanded he be more in social situations. Dr. McElwee noted an anxious mood, but a reactive affect. (R.pp. 492-494). Plaintiff was more anxious on October 16, 2013, and reported taking his son to a football game, but was not able to enjoy it because of anxiety. (R.pp. 489-491). On November 26, 2013, Plaintiff reported being able to go with a friend to take his son to an away football game. He reported having a wreck while pulling a trailer with a tractor on it to a neighbor's house several weeks prior and thereafter having increased anxiety about leaving home. Dr. McElwee noted that Plaintiff was more anxious and dysphoric. (R.pp. 482-484).

Plaintiff's eligibility for DIB thereafter expired on December 31, 2013. (R.p. 21). Therefore, in order to be awarded DIB, Plaintiff must establish that his impairments were of a



11

disabling severity by that date.  See 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a); see also Johnson v. Barnhart, 434 F.3d 650, 656 (4th Cir. 2005)[noting that a claimant is required to establish that claimant became disabled prior to the expiration of claimant's insured status].

**Discussion**

Plaintiff, who was thirty-seven years old on his alleged onset date of disability and forty-two years old at the time he was last insured for DIB benefits, has a high school education plus an Associate's Degree in computer programming and past relevant work as an assistant manager and a parts sales clerk  (R.pp. 34, 51, 56, 179, 214).  In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12)  months.  After a review of the evidence  and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[1] of anxiety disorder, OCD, bipolar disorder, depression, hyperhidrosis, degenerative disc disease of the lumbar spine, degenerative joint disease of bilateral shoulders, and obesity (R.p. 21), he nevertheless retained the residual functional capacity (RFC) for light work[2] limited to frequently balancing, stooping, kneeling, crouching, and climbing ramps and

---

[1]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).



stairs; occasionally crawling; never climbing ladders, ropes, and scaffolds; frequently using his bilateral upper extremities for reaching, both overhead and in all other directions; frequently using hand and foot controls bilaterally; never be exposed to unprotected heights or moving mechanical parts; and occasionally to less than occasionally having contact with wetness and humidity.  The ALJ also found that Plaintiff should have only occasional interaction with supervisors, coworkers, and the public; could understand, remember, and carry out one or two-step instructions and tasks free of fast-paced or team-dependent production requirements involving simple work-related decisions and occasional, if any workplace changes; and would be off task for a maximum of five percent of the workday. (R.p. 26).  At step four, the ALJ found that Plaintiff was unable to perform any of his past relevant work with these limitations.  (R.pp. 34).  However, the ALJ obtained testimony from a vocational expert (VE) and found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy with these limitations, and was therefore not disabled during the period at issue.  (R.pp. 35-36).

Plaintiff asserts that in reaching this decision, the ALJ erred as to his RFC finding (he primarily argues that the ALJ failed to provide adequate reasons for rejecting the opinions of Plaintiff's treating psychiatrist and treating family physician); failed to comply with SSR 96-7p in rejecting Plaintiff's subjective testimony regarding the severity of his symptoms and limitations; and erred by ignoring the VE's testimony that there was no work that Plaintiff could perform upon a proper consideration of all of his limitations. After careful review of the record and consideration of the arguments presented, the undersigned is constrained to agree with the Plaintiff that this case should be reversed and remanded due to the ALJ's failure to properly evaluate the opinion of Plaintiff's treating psychiatrist, Dr. McElwee.



On May 8, 2015, Dr. McElwee completed a Psychiatric Review Technique form and a Medical Source Statement for the Plaintiff. (R.pp. 574-592). He also submitted a separate statement in which he wrote that the limitations and opinions reflected on these forms had been present since at least October 13, 2009. (R.p. 575). On the Psychiatric Review Technique form, Dr. McElwee opined that Plaintiff had anxiety-related disorder evidenced by general persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, and vigilance and scanning; a persistent irrational fear of a specific object, activity or situation which resulted in a compelling desire to avoid the dreaded object, activity, or situation; recurrent severe panic attacks; and recurrent obsessions or compulsions which were a source of marked distress. He thought that these impairments resulted in moderate restrictions in Plaintiff's activities of daily living; extreme difficulties in Plaintiff's social functioning; and marked difficulties in Plaintiff's ability to maintain concentration, persistence, or pace. Dr. McElwee did not answer the question on the form concerning episodes of decompensation, each of extended duration, but wrote "continuous" at the bottom of the form. (R.pp. 576-586).

On the Medical Source Statement, Dr. McElwee opined that Plaintiff would constantly be able to understand, remember, and carry out simple job instructions and to maintain personal appearance; frequently (defined on the form as 34% to 66% of an 8-hour working day) be able to follow work rules, use judgment, function independently, demonstrate reliability, and understand, remember, and carry out detailed (but not complex) job instructions; occasionally (6% to 33% of an 8-hour working day) be able to maintain attention/concentration, behave in an emotionally stable manner, and understand, remember, and carry out complex job instructions; and rarely (1% to 5% of an 8-hour working day) be able to relate to co-workers, deal with the public, interact with supervisors,



14

deal with work stresses, and relate predictably in social situations. Additionally, Dr. McElwee thought that Plaintiff's mental impairment would interfere with the completion of an eight-hour workday and that Plaintiff would be absent from work more than four days a month. In support of the limitations he found as to Plaintiff's ability to make performance adjustments (ability to understand, remember and carry out instructions), Dr. McElwee wrote that Plaintiff's obsessions and anxiety would interfere with his concentration and ability to perform complex tasks. In support of the limitations he found as to Plaintiff's ability to make personal and social adjustments, Dr. McElwee wrote that Plaintiff rarely left his home and required medication to be around other people. Dr. McElwee further stated that Plaintiff took psychiatric medication and underwent psychotherapy for his condition and that the medical/clinical findings that supported his assessment were that Plaintiff had severe social anxiety and obsessive compulsive disorder with little social interaction. (R.pp. 590-592).

Plaintiff contends that the ALJ's RFC finding is not supported by substantial evidence because the ALJ failed to provide adequate reasons for rejecting the opinion of Dr. McElwee, his treating psychiatrist.[3] A treating physician's opinion is ordinarily entitled to great weight; see Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996)[Noting importance of treating physician opinion]; is entitled to deference, and must be weighed using all of the factors provided for in 20 C.F.R.

---

[3] Plaintiff also argues that the ALJ failed to include in his RFC determination findings from consulting physician Dr. Keith that Plaintiff had significant difficulty staying on task and frequently needed redirection. The ALJ gave "moderate to significant weight" to Dr. Keith's opinions; (R.p. 31); even though Dr. Keith's finding that Plaintiff had significant difficulty in staying on task and frequently needed redirection is supportive of Dr. McElwee's opinions concerning Plaintiff's ability to maintain concentration, persistence, or pace, which were rejected by the ALJ. (R.p. 32).



§§ 404.1527, 416.927. See SSR 96-2p.[4] Under these regulations, a treating source's opinion on the nature and severity of an impairment is entitled to "controlling weight" where it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. Further, the ALJ is required to provide an explanation in the decision for what weight is given a treating source's opinion and, if rejected, why it was rejected. See 20 C.F.R. §§ 404.1527(c), 416.927(c). Specifically, the Regulations provide that, if a treating source's opinion is not accorded controlling weight, the ALJ is required to consider "all of the following factors in deciding the weight we give to any medical opinion": (1) examining relationship ("[g]enerally, we give more weight to the opinion of a source who has examined you than the opinion of a source who has not examined you"); (2) treatment relationship, including length of treatment relationship, frequency of examination, and the nature and extent of the treatment relationship; (3) supportability ("[t]he more a medical source presents relevant evidence to support an opinion ... the more weight we will give that opinion"); (4) consistency; (5) specialization; and (6) other factors. 20 C.F.R. § 416.927(c).

Here, the ALJ stated that he gave little to limited weight to Dr. McElwee's opinion because it was not consistent with the evidence that Plaintiff was not continuously decompensating; the findings on the Psychiatric Review Technique form were conclusory and not "explicated"; the two opinions were inconsistent with each other; the Medical Source Statement utilized the undefined

---

[4]It is noted that for claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 416.920c. However, the claim in the present case was filed before March 27, 2017, and Plaintiff's claim has therefore been analyzed pursuant to the treating physician rule set out above.



"rarely" category too often to be probative; and because Dr. McElwee's opinions were not consistent with his own treatment notes. (R.pp. 32-33).[5]  It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." Craft v. Apfel, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).  In this case, however, the ALJ does not appear to have properly applied the factors from § § 416.1527 and 416.927 or correctly evaluated the opinion of Dr. McElwee. See 20 C.F.R. § 416.927(c)(2) [requiring ALJ to give "good reasons" for weight given to treating source's opinion]; see also Ware v. Astrue, No. 5:11-CV-446-D, 2012 WL 6645000, at *2 (E.D.N.C. Dec. 20, 2012) [noting that the ALJ need not discuss all the factors, but "must give 'good reasons' for the weight assigned to a treating source's opinion."](citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), and SSR 96–2p, 1996 WL 374188, at *5).

First, it is unclear whether the ALJ considered the fact that Dr. McElwee is both a specialist and Plaintiff's treating psychiatrist.  At step three, the ALJ discounted Dr. McElwee's opinion that Plaintiff met or equaled the Listing of Impairments[6] at 12.06 (anxiety-related disorders),

---

[5]Plaintiff also argues that the ALJ erred in discounting the opinion of his treating family physician Dr. Perey. The ALJ discounted Dr. Perey's (Plaintiff's treating physician) March 2013 opinion because it did not contain any particular functional limitations, he was not the primary treating source for Plaintiff's psychological issues, he did not complete all questions on the form (particularly the questions concerning medications and recommended care), his opinion about "serious" limitations was not defined, and his opinion was internally inconsistent.  (R.p. 33).

[6]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). In order to meet a listing, a claimant's impairment must "meet *all* of the specified medical criteria."

(continued...)



stating in doing so that Dr. McElwee was "the claimant's primary care family physician but not a psychological [sic]". (R.p. 25). However, this finding would appear to be clear error, as Dr. McElwee is a psychiatrist. As such, instead of the lesser weight assigned to this opinion by the ALJ, it actually should have been accorded even more weight than would have usually been assigned. See 20 C.F.R. § 404.1527 [opinion of a specialist about medical issues related to his or her area of specialty generally entitled to more weight than the opinion of a physician who is not a specialist]. When he later discusses his reasons for discounting the opinion of Dr. McElwee, the ALJ does state that Dr. McElwee is a treating physician and treated Plaintiff for mental and psychiatric complaints ["Dr. McElwee is a treating source for psychiatric issues"], but again there is no indication that he addressed Dr. McElwee's opinions and findings as a specialist in that field (psychiatrist). (R.p. 32).

Further, although he acknowledged that Dr. McElwee is a "treating source", the ALJ nonetheless gave little to limited weight to Dr. McElwee's opinions, finding that they were not fully consistent with his treatment notes from October 2014, December 2014, and January 2015. (R.p. 32). However, although these notes do cover part of the time included in Dr. McElwee's opinions, they are from *after* Plaintiff's date last insured. While it may be that the ALJ concluded that Dr. McElwee's earlier records also support a decision to discount his Medical Source Statement and Psychiatric Review Form, that is not clear from the decision itself. Morales v. Apfel, 225 F.3d 310, 317-318 (3d Cir. 2000) [ALJ must explicitly weigh the evidence and explain his rejection of the medical opinion of a treating physician]. Moreover, the treatment notes referenced, as well as Dr. McElwee's earlier records, indicate that Plaintiff continually reported OCD and social phobia

---

[6](...continued)
Id. (emphasis in original). Plaintiff has not argued in his brief that Plaintiff met or equaled Listing 12.06.



18

problems and that Dr. McElwee's psychological examinations indicated that Plaintiff had anxiety. Particularly with respect to Dr. McElwee's opinion that Plaintiff can only occasionally maintain attention and carry out complex instructions; rarely relate to co-workers, deal with the general public, interact with superiors, or deal with work stresses; and that Plaintiff would be absent from work four times per month, even though the ALJ found that this opinion was not consistent with Dr. McElwee's own treatment notes, those notes document that Plaintiff's obsessive-compulsive symptoms led to conflicts at work, that his strong anxiety (agoraphobia) led him to avoid being around people or in groups altogether, that he suffered from superstitious behaviors, that he suffered from a social phobia and had difficulty with repetitive thoughts, that he suffered with debilitating sweating, from panic attacks, and has obsessive and rigid thought processes, all symptoms that could support some of the conclusions noted by Dr. McElwee on his Medical Source Statement and Psychiatric Review form.[7] As such, these records do not support the ALJ's conclusion that Dr. McElwee's opinion was inconsistent with his own treatment notes.  (R.pp. 32-33).  Laws, 368 F.2d at 642 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

---

[7]Even with respect to the post-DIB eligible treatment notes referenced by the ALJ in his decision, at the October 2014 visit, Plaintiff reported some improvement in compulsions, but no improvement in phobia and he complained of excessive sweating in public and anxiety about being away from home.  Dr. McElwee noted that Plaintiff "still becomes anxious very easily." (R.pp. 442-445). In December 2014, Plaintiff reported progress in controlling his obsessive-compulsive symptoms, but frustration in not being able to make progress with social anxiety.  He took his son to a football game, but was extremely anxious and exhausted by the experience and had to take three Xanax to remain at the stadium.  Dr. McElwee noted that Plaintiff was pleasant and had a reactive affect, but was anxious. (R.pp. 438-441). In January 2015, Plaintiff reported forcing himself to attend his son's school programs over the holidays, but having to take some Xanax to do so and trying to go out with his son to eat pizza, but not being able to do so as the restaurant was crowded and loud. Dr. McElwee noted that Plaintiff was "more anxious today when discussing his concerns about his son and his early childhood experiences."  (R.pp. 435-37).



19

Additionally, the ALJ discounted Dr. McElwee's opinion in part because on the Medical Source Statement form Dr. McElwee purportedly "utilize[d] an undefined 'rarely' category too often to be probative". (R.p. 32). However, as correctly argued by Plaintiff, this reason for discounting the opinion is not supported by substantial evidence, as "rarely" was not an "undefined" term, but is instead specifically defined on the form as meaning "1% to 5% of an 8-hour working day" (R.p. 590).[8] The ALJ also appears to have discounted Dr. McElwee's opinion in part because he found that Plaintiff was not continuously decompensating. (R.p. 32). However, although the ALJ's determination that Plaintiff was not continuously decompensating appears to be supported by substantial evidence, it is unclear that Dr. McElwee, who failed to check any box on the form as to whether Plaintiff had episodes of decompensation each of extended duration, but wrote "continuous" at the bottom off the form, opined that Plaintiff was continuously decompensating.[9]

As support for the ALJ's decision, the Commissioner argues that Dr. McElwee's opinions are contradicted by the opinions of the state agency physicians Dr. Horn and Dr. Harkness. The ALJ stated that he gave some weight to the opinions of Drs. Horn and Dr. Harkness,[10] who found that Plaintiff could perform simple routine tasks away from the public, because their opinions were generally consistent with the medical record and Plaintiff's complaints, but did not fully account for Plaintiff's poor social functioning. (R.p. 31). However, the ALJ's determination that Plaintiff could

---

[8]It may be that such a definition does not comport with the Social Security Regulations, but that is not what the ALJ wrote. Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001)[Court cannot affirm a decision on a ground that the ALJ did not himself invoke in making the decision]. The Commissioner has not addressed this argument in her Brief.

[9]Again, the Commissioner does not address these arguments.

[10]These opinions, rendered in July and September 2013, are prior to the opinions of Dr. McElwee in May 2015.



have occasional contact with the public does not appear to be consistent with his decision to give some weight to the opinion that Plaintiff could perform "simple routine tasks away from public" (R.pp. 100, 116).

The Commissioner also argues that Dr. McElwee's opinions were properly discounted because they are contained in fill-in-the-blank and check-the-box style forms that the ALJ is not required to accord controlling weight. However, this argument is only a post hoc rationalization for upholding the decision, since the ALJ made no reference to this having any influence on the findings in his decision. See Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990) ["Implicit" rejection of treating physician's opinion cannot satisfy Administration's obligation to set forth "specific, legitimate reasons" for rejecting a treating physician's opinion]; see also Ellis v. Astrue, No. 07–3996, 2009 WL 578539, at * 8 (D.S.C. Mar. 5, 2009) [Rejecting post hoc rationale for ALJ's decision]. While the ALJ may have given less weight to the treating physician opinions on this basis, it was incumbent on the ALJ to make and explain that specific finding. See Nester v. Astrue, No. 08–2045, 2009 WL 349701, at * 2 (E.D. Feb. 12, 2009) [Noting that the Court "may not consider post hoc rationalizations but must evaluate only the reasons and conclusions offered by the ALJ."].

Therefore, the undersigned finds that the decision should be reversed and remanded for a full and proper consideration of all of the evidence and opinions of Dr. McElwee in compliance with the applicable standard of review for such opinions. With respect to the remainder of Plaintiff's claims of error, the ALJ will be able to reconsider and re-evaluate the evidence in toto as part of the reconsideration of this claim. Hancock v. Barnhart, 206 F.Supp.2d 757, 763-764 (W.D.Va. 2002)[On remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted de novo].



**Conclusion**

Based on the foregoing, and pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner with remand in Social Security actions under Sentence Four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be **reversed**, and that this case be **remanded** to the Commissioner for a proper consideration and analysis of the opinions of treating psychiatrist Dr. McElwee, and for such further administrative action as may be necessary and appropriate. See Shalala v. Schaefer, 509 U.S. 292 (1993).

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

March 7, 2018
Charleston, South Carolina



22

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).